797 A.2d 63

**R.D. GREENFIELD, et ux.,**

v.

**Udo HECKENBACH, et al.**

**No. 1779 Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 1, 2002.

110

Richard A. DeTar (Miles & Stockbridge, P.C., on brief) Easton, for appellants.

Benjamin Rosenberg (Anne Kelly Laynor, Rosenberg, Proutt, Funk & Greenberg, LLP, Baltimore, Willard C. Parker, II and Leigh R. Melton, Easton, on brief) for appellees.

Argued before DAVIS, SALMON, BARBARA K. HOWE, (Ret., Specially Assigned), JJ.

SALMON, J.

In late 1997, Robert D. Greenfield and his wife, Marguerite Greenfield ("the Greenfields"), bought, for 1.6 million dollars, a 24.5 acre improved parcel of land located in Talbot County, Maryland. The sellers of the property were Udo Heckenbach and his wife, Cornelia Heckenbach ("the sellers" or "the Heckenbachs"). Approximately twenty-one months after the purchase of the property, the Greenfields sued the Hecken-

bachs claiming that, prior to the sale, the Heckenbachs either fraudulently or negligently misrepresented their development plans for an adjoining parcel of land—which the Heckenbachs also owned. According to the complaint, the misrepresentations by the Heckenbachs induced the Greenfields to make the 1.6 million dollar purchase.

The two main counts in the Greenfields' complaint were tort claims for which the plaintiffs sought damages or, alternatively, equitable relief (injunction). The Greenfields did not allege that the Heckenbachs breached the contract for the sale of the land.

One of the primary contentions advanced by the Heckenbachs in the lower court was that the parol evidence rule acted as a complete bar to the introduction into evidence of any pre-contractual representations made by the sellers that would add to or vary the written sales contract. This contention was accepted by the trial judge and ultimately led to his grant of summary judgment in favor of the Heckenbachs as to the two main counts.

The exclusionary effect, if any, of the parol evidence rule in a tort action often presents thorny issues. *See Weisman v. Connors*, 312 Md. 428, 456–57 n. 4, 540 A.2d 783 (1988).[1] In

---

1. The *Weisman* Court said:

 We ... note that the availability of both tort and contract actions for the same kind of harm has engendered considerable confusion and complexity. *See Prosser and Keeton on the Law of Torts* § 92, at 655 (5th ed.1984). *One thorny question has concerned the effect that the parol evidence rule has on tort actions when the tort and contract actions are based on the same set of facts.*

 In *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), we reserved judgment on whether the parol evidence rule precluded a tort action based on a negligent misrepresentation that contradicted a term of the contract between the parties to the tort suit. 294 Md. at 119 n. 13, 448 A.2d 332. We there affirmed the related principle that in a suit for rescission of a contract the parol evidence rule precludes the granting of relief for unintentional representations preceding the contract which conflict with the terms of the contract.

 Some authorities indicate that oral precontractual representations cannot support an action in negligent misrepresentation if the representation varies or contradicts the terms of a subsequent written contract. *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th

the case at hand, we are called upon to resolve some of those issues.

Broadly speaking, the main question presented is whether the trial judge was legally correct in granting the Heckenbachs' motion for summary judgment as to Count I (fraud) and Count II (negligent misrepresentation). In view of the nature of that broad question, the facts set forth in Part I are presented in the light most favorable to the Greenfields, the non-prevailing party below. *See* Md. Rule 2–501; *see also Jones v. Mid–Atlantic Funding Co.*, 362 Md. 661, 676, 766 A.2d 617 (2001). It should be noted, however, that many of these facts are disputed by the Heckenbachs.

## I.

In 1997, the Heckenbachs owned and resided at "Windrush Farm" located in Royal Oak, Maryland. The Heckenbachs wanted to sell Windrush Farm and with that goal in mind listed the property with a real estate firm known as Sharp, Critchlow, Nash & Crouch ("SCN & C"). Their asking price was $1,950,000. SCN & C prepared a brochure that included the following description of the property and its environs:

> [A]n area of large farms and estates known as Deep Neck, "Windrush Farm" will take you back in time with its meticulously restored and renovated 19th century farm house, guest house, horse stable, pump house and numerous other dependencies including a tenant house, pool and pool house, tennis court, three-bay garage, and barn. A recent visitor affectionately described this property as being like "a little village," and indeed it does recall the age of self-sufficient farms and southern plantations.

---

Cir.1977); Hill, *Damages for Innocent Misrepresentation*, 73 Colum. L.Rev. 679, 717–18 (1973). No cases, however, address the converse question of the effect to be given in a negligent misrepresentation case to precontractual representations that are consistent with later contract terms.

*Weisman*, 312 Md. at 456–57 n. 4, 540 A.2d 783 (emphasis added.)

Complimenting this idyllic setting you will find a fruit orchard, fenced vegetable garden, rose and perennial gardens, pasture, woodland and according to a local tree and landscape expert, "perhaps the finest variety of trees on any one estate in Talbot County."

The main house, a classic, vernacular Eastern Shore farm house (stately and at the same time understated and unpretentious), offers over 4,500 sq. ft. of living space and *provides incredible natural and unspoiled southwesterly views across Irish Creek and the Choptank River from nearly every room. . . .* [2]

(Emphasis added.)

Windrush Farm is adjoined by a twenty-two acre, unimproved parcel of land known as "Wind*field* Farm." That farm is also owned by the Heckenbachs.

In July 1997, the Greenfields learned from Francis Maffitt, a realtor employed by SCN & C, that Wind*rush* Farm was available for purchase. Cornelia Heckenbach, one of the sellers, was the listing agent for the property and an agent of SCN & C.

The Greenfields had direct negotiations with the Heckenbachs about the purchase of Windrush Farm, starting in late July or early August 1997. During these discussions, the Heckenbachs told the Greenfields that they owned Windfield Farm and that they intended to construct a main house, garage/apartment, pool, and timber pier on that land. Because Windfield Farm was situated between Windrush Farm and Irish Creek, the Greenfields asked the Heckenbachs how this building project would impact the water view from Windrush Farm. According to the Greenfields, the Heckenbachs told them that they would "not construct anything on [Windfield Farm] . . . that would obstruct clear view [from Win-

---

2. The writer of the brochure inadvertently used the phrase "southwesterly view"; the intended phrase was "southeasterly view."

drush Farm] across Irish Creek and the Choptank River or significantly block the view down Irish Creek." [3]

In addition to the more general representation that they would not "construct anything" on Windfield Farm that would obstruct the purchasers' clear view across Irish Creek and the Choptank River, or significantly block the view from Windrush Farm down Irish Creek, the Heckenbachs made the following more specific representations:

 A. [The Windfield Farm's] pier would be located slightly east of the middle of the south-facing water frontage on [Windfield Farm so] that it would not even be visible from [the Windrush Farm property];

 B. [The main house to be constructed on Windfield Farm] would be "smaller" than the existing main house on the [Windrush Farm] [p]roperty; and

 C. [Windfield Farm's main] house would be located where a grove of trees was then located on the eastern side of [the Windfield Farm] [p]roperty so as to avoid significantly interfering with [the Greenfields'] water view down Irish Creek.

The Heckenbachs representations concerning their construction plans were a material factor in persuading the Greenfields to offer to purchase Windrush Farm. The offer was accepted on August 11, 1997. The contract of sale was in the form of a multi-page printed contract with four printed

---

3. The language just quoted is based on an allegation contained in Paragraph 30 of the Greenfields' complaint. In an affidavit filed by Mrs. Greenfield in opposition to the Heckenbachs' motion for summary judgment, Mrs. Greenfield says that everything in the complaint is true. And, the Heckenbachs admitted, for purposes of summary judgment only, the truth of all facts alleged in the complaint. Nevertheless, elsewhere in her affidavit, when relating specifically what the appellees represented to her and her husband, Mrs. Greenfield says that the Heckenbachs simply pointed out where the main house, pier, guest house, and garage were to be located on the property and said that the construction of those improvements would not interfere with the river view from Windrush Farm. If the representations were thus limited, this would not preclude the possibility that barns, trees, or other obstructions to the water view could later be created by the Heckenbachs on Windfield Farm.

addenda, a partially typed and partially handwritten addendum, and numerous disclosure statements. The printed forms contained several handwritten changes and deletions made by the Greenfields. One of the provisions in the contract was a general form integration [or merger] clause that provided:

> This Contract and any Addenda thereto contain the final and entire agreement between the parties, and neither they nor their agents shall be bound by any terms[,] conditions, statements, warranties or representations, oral or written, not herein contained.

In the written contract, no mention was made of the representations by the Heckenbachs regarding their construction plans for Windfield Farm or the promise by them to preserve the buyers' water view across Irish Creek.

The closing for the sale of Windrush Farm was held on December 15, 1997. Sometime before closing (the exact date is not shown in the record), the Heckenbachs poured the foundation for the main house on Windfield Farm and built up the walls of the structure to a height approximately three feet above ground. Additionally, prior to closing, the Heckenbachs staked out the location of the wood pier. Neither the foundation for the main house nor the place where the pier was staked out was where the Heckenbachs had represented it would be in their pre-contract conversations with the Greenfields. The Greenfields, however, did not observe the house foundation or the area where the pier had been staked out prior to closing.

On December 16, 1997, which was the day following closing, the Greenfields went to Florida, where they stayed until approximately April 15, 1998. In the four-month interim during which the Greenfields were absent from Talbot County, the Heckenbachs constructed a pier that jutted out 170 feet from their Windfield Farm property. The pier was approximately 150 feet west of the location where the Heckenbachs had represented that it would be situated. The difference in location was material to the Greenfields because, if the pier had been located as promised, it "would not [have been] visible

from the main house on Windrush Farm." As located, it "destroy[ed] the otherwise unobstructed water view . . . [from Windrush Farm] across Irish Creek. . . ."

Construction of the main house on Windfield Farm proceeded with alacrity, starting in April 1998. By the end of June 1998, the entire main house and its screened porch were framed, the house was under roof, and the doors were installed. The main house, however, was not located "in the grove of trees on the eastern side of" Windfield Farm. Instead, it was situated "approximately one hundred feet (100') west of the grove of trees." Moreover, the main house was much larger than the existing main house on Windrush Farm. Because of its size and location, the Heckenbachs' new home "substantially impair[ed] the [Greenfields'] water view . . . from the main residence on Windrush Farm."

Sometime between June 20 and June 30, 1998, the Heckenbachs hosted a party on Windfield Farm, which the Greenfields attended. The party was held outside, and the Heckenbachs' guests, including the Greenfields, were given a tour of the new main house.

Despite knowledge that the pier and main house were not constructed where the Heckenbachs said they would be constructed, the Greenfields made no protest to the Heckenbachs. Their reason for remaining mute, in Mrs. Greenfield's words, was "because construction was either completed or substantially completed" on the pier and main house, which made the Greenfields realize that "complaining to the Heckenbachs after the fact would not resolve our concerns." The main house was fully completed in October 1998.

In August 1999, the Greenfields discovered, while in the Talbot County planning and zoning office investigating an unrelated matter, that the application that the Heckenbachs had submitted for a permit to construct the pier on Windfield Farm located the proposed pier "precisely where the Heckenbachs had [pre-contractually] represented . . . [to them that] the pier would be constructed." The Greenfields also discovered "that the building permit for the main house on Windfield

[Farm] stated that the house was to be 3,800 square feet," which was smaller in size than the main house on Windrush Farm. Armed with this information, which the Greenfields viewed as corroborating their claim of pre-contractual fraudulent and/or negligent misrepresentation, they filed suit against the Heckenbachs in the Circuit Court for Talbot County on September 10, 1999.

The complaint filed by the Greenfields has five counts. Count I (fraud) and Count II (negligent misrepresentation) prayed for both legal and equitable relief. In regard to monetary relief, the plaintiffs asked for damages "in an amount to be determined but which substantially exceeds $25,000." For equitable relief, they asked that the timber pier erected by the Heckenbachs be removed and that the main house be relocated so that it will be in "full compliance with the terms of the Residential Permit issued to [the Heckenbachs] and the representations [the Heckenbachs] made to [the Greenfields]." In addition, plaintiffs ask, as equitable relief, that the Heckenbachs be ordered to "[p]lant and maintain sufficient mature trees to block the view of [the Heckenbachs' house] from [Windrush Farm] where said house extends westerly beyond the grove of trees where [the Heckenbachs] represented that their house would be built."

Count III asserted that the Heckenbachs' construction of both the pier and the main house violated the building permits issued by Talbot County.[4] The fourth count alleged that the erection of the pier violated the "wetlands license" that the

---

4. Count III alleged that the main house built on Windfield Farm violated the terms of the building permit inasmuch as that permit authorized a house "not exceeding 3,800 square feet of heated area, with two [2] single story wings and 500 square feet in [an] unheated area." The main house as built by the Heckenbachs exceeds 3,800 square feet in heated space, exceeds 500 square feet in unheated space, and exceeds the single story wing limitation imposed by the permit. As for the pier, the Greenfields alleged that the pier as built violates a setback requirement. Therefore, according to the Greenfields, "both the house and pier were built in violation of the permits issued by Talbot County."

Heckenbachs were issued prior to constructing the timber pier. The fifth count is captioned "Unjust Enrichment."

The Heckenbachs filed an answer to the complaint, in which they denied making any of the oral construction plan representations alleged by the Greenfields. They also filed a motion for summary judgment, supported by an affidavit signed by Mrs. Heckenbach and interrogatory answers filed by the Greenfields. The interrogatory answers showed, *inter alia,* that both of the Greenfields were licensed attorneys who had previously bought or sold land on numerous occasions.

The plaintiffs responded by filing an opposition to the summary judgment motion, together with various exhibits and an affidavit by Mrs. Greenfield.

Shortly before a hearing on the motion for summary judgment, the Heckenbachs were forced by governmental authorities to remove the pier on Windfield Farm because it extended more than 150 feet into Irish Creek. Therefore, the only item constructed by the Heckenbachs that is currently blocking the Greenfields' water view is the main house on Windfield Farm. The Heckenbachs, however, plan—if allowed to do so—to build a shorter (150') pier, but at the same location.

After hearing oral argument on the matter, the motions judge granted summary judgment in favor of the Heckenbachs on all counts. His reasons for doing so was based on the "reasoning, analysis, and authorities set forth in [d]efendants' memorandum filed in support of their motion for summary judgment ... as well as [those reasons] asserted by counsel for [d]efendants at the hearing on said motion."

In their motion for summary judgment, the Heckenbachs advanced numerous reasons why summary judgment should be granted. We will, therefore, discuss each of those reasons.

## II. *ANALYSIS*

As to Counts III and IV, the reasons successfully advanced by the Heckenbachs in favor of the grant of summary judgment was that the Greenfields had no standing to

object, even if the house and/or the pier did violate either the terms of the building permit or the terms of the wetlands license. In the Greenfields' initial brief, they do not argue that the motions judge erred in granting summary judgment as to Counts III and IV, nor do they advance such an argument in their reply brief. Accordingly, appellants waived any right they otherwise would have had to object to the grant of summary judgment as to Counts III and IV. The grant of summary judgment as to those counts shall be affirmed.[5]

■ In arguing that summary judgment should be granted as to Count V, one of the reasons advanced by the Heckenbachs was that appellants could not succeed on an unjust enrichment theory because plaintiffs had no proof that they (the Greenfields) had conferred any benefit upon the Heckenbachs. In their brief, the appellants do not argue that the trial judge was wrong in accepting that argument. Therefore, any contention that the trial judge erred in granting summary judgment as to Count V is waived.[6]

## III. *THE PAROL EVIDENCE RULE AS IT RELATES TO COUNT I—THE FRAUD COUNT*

■ "The legal principles which govern here are well established in Maryland. As long ago as 1869, Judge Miller, speaking for the Court, said in *Bladen v. Wells*, 30 Md. 577, 581:

'No principle of law is more firmly settled than that which excludes parol evidence from being used either at law or in equity for the purpose of contradicting, adding to, subtracting from, or varying the terms of a deed, or controlling its legal operation and effect, *except where it*

---

5. At oral argument, appellants' counsel agreed that his clients had waived any argument they might have had to object to summary judgment as to Counts III and IV due to the failure to brief any issues concerning those counts.

6. At oral argument, appellants' counsel also admitted that his clients had waived, by not briefing the issue, the argument that the trial judge erred in granting summary judgment as to the unjust enrichment count.

*is impeached for fraud, or where it is sought to be reformed upon the allegations of fraud, accident or mistake.'*

This is generally referred to as the merger doctrine, and many decisions pertinent thereto are collected in 6 M.L.E., *Conveyances,* § 94." *Id.* at 598–99.

*Canatella v. Davis,* 264 Md. 190, 200, 286 A.2d 122 (1972) (emphasis added) (citing *Mullins v. Ray,* 232 Md. 596, 598–99, 194 A.2d 806 (1963)); *see also Donovan v. Kirchner,* 100 Md.App. 409, 419, 641 A.2d 961 (1994).

 The Heckenbachs contend that, if trial were held in this matter, the parol evidence would prevent the Greenfields from testifying as to the alleged oral representations concerning the Heckenbachs' construction plans for Windfield Farm because such testimony would contradict the words in the integration clause contained in the written contract. While the Heckenbachs obliquely acknowledge that the parol evidence rule contains an exception for fraud, they contend that the fraud exception is inapplicable here. As will be shown, the case of *Fowler v. Benton,* 229 Md. 571, 583, 185 A.2d 344 (1962), demonstrates that the existence of an integration clause in a written contract, standing alone, does not bar a fraud count such as the one set forth in Count I.

In *Fowler,* the plaintiffs negotiated with C.P. Benton for the purchase of a home located in Prince George's County. *Id.* at 573, 185 A.2d 344. Benton, a builder with over thirty-five years' experience, owned a five-room house with one bathroom. *Id.* At the time Benton negotiated the contract with the plaintiffs, Benton knew that the plaintiffs' family consisted of nine children and two adults. *Id.* at 573, 581, 185 A.2d 344. In pre-contract negotiations, Benton agreed with the plaintiffs to make certain alterations and additions to the house, which, when completed, increased its size to "five bedrooms, two baths, living room, dining room, and kitchen." *Id.* at 573, 185 A.2d 344. Mrs. Fowler (one of the plaintiffs) asked Benton during pre-contract negotiations if she and her husband "could rely upon the septic system installed in the home." *Id.* at 574,

185 A.2d 344. Benton replied that "there wasn't any reason in the world why [the plaintiffs] couldn't feel that it was adequate because it had been put in according to Health Department regulations and that it had been approved by the County Health Department." *Id.* While it was true that the septic system was constructed according to the permit issued to Benton by the health department, the system had not been approved after the additions to the house had been made. *Id.*

Soon after the Fowlers purchased the home from Benton, serious septic problems developed. *Id.* The Fowlers subsequently brought suit against Benton, and others, alleging, *inter alia,* fraud and deceit. *Id.* at 573, 185 A.2d 344. At the conclusion of the plaintiffs' case, the trial judge directed a verdict in favor of Benton on the fraud and deceit counts. *Id.* The Court of Appeals reversed the judgment as to Benton, holding that there was sufficient evidence from which the jury could find that Benton sold the house to the plaintiffs knowing that the septic system was inadequate for a family of eleven and thus had intentionally made a false representation; additionally, the Court found that all the other elements necessary to show fraud had been proven. *Id.* at 580–82, 185 A.2d 344.

In *Fowler,* as here, the contract for sale of real estate contained an integration clause, which is sometimes also referred to as a "merger clause." *Id.* at 583, 185 A.2d 344. The *Fowler* Court said:

> Although Benton does not urgently press the point, he mentions, in his brief, that the contract involved herein contained an integration, or merger, clause. We do not find it necessary to discuss the point elaborately. In the first place, there was no objection to the testimony of Mr. and Mrs. Fowler as to the statements made to them by Benton with reference to the adequacy of the sanitary system. *And where fraud is alleged to have caused the execution of a written contract, a merger clause therein is not conclusive.* 5 *Williston, Contracts,* (Third Ed., Jaeger), § 811; *Restatement, Contracts,* § 238. Cf. *Schmidt v. Millhauser,* 212

Md. 585, 130 A.2d 572; *Rinaudo v. Bloom,* 209 Md. 1, 120 A.2d 184.

*Id.* at 583, 185 A.2d 344 (emphasis added).

■ Volume 5, section 811 of Williston on Contracts, cited by the Court in *Fowler,* provides, in relevant part, that a "merger clause is ineffectual to exclude evidence of extraneous prior to contemporaneous representations of either the principal or an agent to establish fraud. . . ."

The *Fowler* case was relied upon in *Fort Howard Cup Corp. v. Quality Kitchen Corp.,* 1992 WL 207276, 1992 Del.Super. Ct. Lexis 337 (1992), where a defendant brought a counterclaim for, *inter alia,* negligent misrepresentation and fraud. *Id.,* 1992 WL 207276 at *1, 1992 Del.Super. Ct. Lexis 337 at *3. Applying Maryland law, the Court said:

Plaintiffs argue the parol evidence rule bars defendant from introducing evidence on the fraud and misrepresentation counterclaims. Plaintiffs point to a merger clause in the lease agreement and suggest the Court may consider only the language in the lease agreement to discern the parties' complete understanding. Plaintiffs contend the agreement clearly reflects defendant knowingly opted to rent the model 1100 which it obtained and nothing in the lease indicates defendant hoped to obtain the purported higher quality model 6500 machine.

*An allegation that fraud caused the execution of an agreement renders a merger clause in that agreement inconclusive. Fowler v. Benton,* 229 Md. 571, 185 A.2d 344, 352 (1962). Under Maryland law, "the materiality of a misrepresentation turns on the facts of a particular case." *Chesapeake Homes, Inc. v. McGrath,* 249 Md. 480, 240 A.2d 245 (1968). Similarly, Delaware courts have recognized numerous exceptions to the parol evidence rule including evidence to prove fraud or to prove a collateral or separate agreement. *Scott–Douglas v. Greyhound Corp.,* Del.Super., 304 A.2d 309, 315 (1973).

Maryland courts have endorsed the views expressed by Professor Corbin concerning the parol evidence rule:

Its name has distracted attention ... from the real issues that are involved which "may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract" ... "In determining these issues, or any of them there is no parol evidence rule to be applied. On these issues, no relevant evidence, whether parol or otherwise is excluded. No written document is sufficient, standing alone, to determine any one of them...."

*Smith v. Rosenthal Toyota, Inc.*, 83 Md.App. 55, 573 A.2d 418 (1990), *cert. denied*, 320 Md. 800, 580 A.2d 219 (quoting *Whitney, Exec. v. Halibut*, 235 Md. 517, 527, 202 A.2d 629 (1964)).

*Id.*, 1992 WL 207276 at *3, 1992 Del.Super. Ct. Lexis 377 at *7–8 (emphasis added).

The Heckenbachs rely heavily on *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.1977) in support of their argument that in the case *sub judice* the parol evidence rule would defeat the Greenfields' fraud count. In *Call Carl*, the plaintiffs were ten independent service station operators who were notified that their leases and franchise agreements with BP Oil would not be renewed when their contracts expired. *Id.* at 624. All the operators' lease and franchise agreements with BP specified that, after an initial period of time, the leases would be renewed thereafter "for successive terms of one year each, provided, however, that either party may terminate the lease at the end of the first one-year term or any successive yearly term on Thirty (30) days' written notice given prior to the end of any such term." *Id.* at 625. In September of 1973, despite the fact that the plaintiffs had not violated their agreements with BP over several successive terms, BP gave thirty days' notice to the plaintiffs that their dealerships would be terminated at the expiration of their terms. *Id.* The plaintiffs contended that they were induced by BP's agents to enter into the franchise agreements with a knowingly false

oral representation that the agreements, although of one-year terms, would be renewed annually as long as the plaintiffs complied with their contractual obligations. *Id.* at 628–29. Plaintiffs sued BP in federal court for antitrust violations as well as state law claims for breach of contract, fraud, and deceit. *Id.* at 624. The jury found in favor of BP (and a co-defendant) on the breach of contract count but found the defendants liable, applying Maryland law, for fraud and deceit. *Id.* at 624–25.

The court in *Call Carl* accurately pointed out that under Maryland law, five elements must be proven to recover on a fraud count:

(1) a representation made by a party was false; (2) its falsity was either known to the party or made with such reckless indifference to the truth to impute knowledge; (3) the misrepresentation was made for the purpose of defrauding some other person; (4) that person reasonably acted in reliance upon the misrepresentation with full belief in its truth, and he would not have done the thing from which damage resulted had it not been made; and (5) the person so acting suffered damage directly resulting from the misrepresentation.

*Id.* at 629 (citing *James v. Goldberg,* 256 Md. 520, 261 A.2d 753 (1970)).

The Court held that the first four elements had been proven, but as to the fifth—the existence of damages—held that the plaintiffs' proof was insufficient. *Call Carl,* 554 F.2d at 629. The Court said:

It is true that the parol evidence rule presents *no bar to proof of fraud in a fraud and deceit action, Standard Motor Co. v. Peltzer,* 147 Md. 509, 128 A. 451 (1925); nor in an action for rescission even where oral representations are expressly disclaimed in the contract. *Ortel v. Upper Ashburton Realty Co.,* 171 Md. 678, 190 A. 239 (1937). But we do not believe that the Maryland Court of Appeals would extend this principle to permit damage awards that, by the expedient of a fraud label, would severely undermine the

policy of the parol evidence rule, which is grounded in the inherent reliability of a writing as opposed to the memories of contracting parties. See *Housing Authority of College Park v. Macro Housing, Inc.,* 275 Md. 281, 340 A.2d 216 (1975). This result finds support in the case of *Canatella v. Davis,* 264 Md. 190, 286 A.2d 122 (1972), where the court, in an action for fraud and breach of real estate covenants, noted that the relaxation of the parol evidence rule for fraud *is recognized only in the pursuit of equitable remedies, such as reformation or specific performance.* The plaintiff, having sued for damages, was held to have chosen his form of action at law, and was therefore subject to the constraints of the parol evidence rule. If Maryland law will not allow contract damages (as sought here) for loss of an expectancy created in *Canatella* both by oral representation and a previous writing inconsistent with the terms of a deed in an action on its covenants, we do not think it would do so *in a fraud action based wholly on oral representations plainly contradictory to the terms of a contract, as appears in this case.*

*Id.* at 630 (emphasis added).

Contrary to the language used in *Call Carl,* the *Canatella* Court did not "note[ ]" that "the relaxation of the parol evidence rule for fraud is recognized only in the pursuit of equitable remedies, such as reformation or specific performance." There was no fraud proven against the seller (*Canatella* ) because there was no showing that the seller knew the representations at issue (the amount of acreage sold) were false or made with reckless indifference to the truth. 264 Md. at 200, 286 A.2d 122. The *Canatella* Court, while saying that the parol evidence rule was applied differently in law as opposed to equity, did not spell out the difference; instead, the Court simply pointed out that the case at hand was a law action where the plaintiffs had failed to prove fraud and that no other exception to the parol evidence rule was applicable. *Id.* at 203–04, 286 A.2d 122.

Insofar as the *Call Carl* Court interpreted Maryland law as meaning that fraud was not an exception to the parol evidence

rule in law actions, we believe the Court was mistaken. *See Fowler*, 229 Md. at 583, 185 A.2d 344. *See also Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 338 n. 7, 439 A.2d 534 (1982) (discussed *infra* ). Moreover, *Call Carl* is distinguishable in another important way. In the *Call Carl* opinion, an integration clause was not even mentioned. Instead, the written contract explicitly contradicted what the plaintiffs claimed was said orally, *i.e.*, the written contract said that BP could end the contract at the end of each one-year term if it chose to do so, while the oral promise was (allegedly) that the contract could not be cancelled at the end of the one-year term—unless the plaintiffs failed to abide by the terms of the agreement.

In the case at bar, the written contract was silent as to any pre-contractual representations. Instead, the merger clause said, in effect, that the parties were not bound by such representations. The distinction was discussed in *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), where the court distinguished a general merger clause (where parol evidence is admitted) from specific disclaimer of reliance upon certain representations (where parol evidence is disallowed). The plaintiff in *Danann claimed* that in negotiations for the purchase of a lease the seller had falsely made representations as to the operating expenses of the premises. *Id.* at 599. The written sales agreement said, however, that the seller "ha[d] not made . . . any representations as to the . . . expenses, operation or any other matter or thing affecting or related to the . . . premises, except . . . [as contained in the agreement], and the Purchaser hereby expressly acknowledges that no such representations have been made. . . ." *Id.* at 598 (emphasis omitted). The written sales contract also contained a general merger clause. *Id.* The *Danann* Court, in distinguishing the case before it from ones in which only a general merger clause was involved, said:

> Here, however, plaintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now

claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations (*Cohen v. Cohen*, ... [144 N.E.2d 649 (N.Y.1957)]), The *Sabo* case ... [143 N.E.2d 906 (N.Y.Sup. Ct.1957)], dealt with the usual merger clause. The present case, as the *Cohen* case, additionally, *includes a disclaimer as to specific representations.*

This specific disclaimer is one of the material distinctions between this case and *Bridger v. Goldsmith (supra)* and *Crowell–Collier Pub. Co. v. Josefowitz* (5 N.Y.2d 998, 184 N.Y.S.2d 859, 157 N.E.2d 730). In the *Bridger* case, the court considered the effect of a *general disclaimer as to representations in a contract of sale,* concluding that the insertion of such a clause at the insistence of the seller cannot be used as a shield to protect him from his fraud.

Consequently, this clause, which declares that the parties to the agreement do not rely on specific representations not embodied in the contract, excludes this case from the scope of the *Jackson, Angerosa, Bridger* and *Crowell–Collier* cases (*supra*). (See *Foundation Co. v. State of New York,* 233 N.Y. 177, 135 N.E. 236.) [7]

*Id.* at 599 (emphasis added).

At oral argument, counsel for the Heckenbachs was asked how he distinguished the *Fowler* case from the case at hand. He replied:

*Fowler* involved, literally, a misrepresentation as to the condition of the property that was being sold.... That is a classic fraud case.... [The Fowlers' claimed] ... "You told me you sold me a Cadillac but in fact you sold me a Chevrolet."

---

**7.** *Crowell–Collier Pub. Co. v. Josefowitz,* 5 N.Y.2d 998, 184 N.Y.S.2d 859, 157 N.E.2d 730 (N.Y.1959); *Foundation Co. v. State of New York,* 233 N.Y. 177, 135 N.E. 236 (1922); *Bridger v. Goldsmith,* 143 N.Y. 424, 38 N.E. 458 (1894); *Angerosa v. White Co.,* 248 A.D. 425, 290 N.Y.S. 204 (N.Y.App.Div.1936); and *Jackson v. State of New York,* 210 A.D. 115, 205 N.Y.S. 658 (1924).

Counsel went on to say, quoting from *Call Carl, Inc., et al. v. BP Oil Company,* 554 F.2d at 631, "A fraud action can only be predicated on misrepresentation of past or existing fact; breach of future promises lies in the realm of contract." [8]

The argument is unpersuasive. The Court in *Weisman v. Connors,* 312 Md. 428, 540 A.2d 783 (1988), said: "[t]hat the misrepresentation of one's own intention may constitute the misrepresentation of a present fact is clear." *Id.* at 456, 540 A.2d 783 (citing *Levin v. Singer,* 227 Md. 47, 63–64, 175 A.2d 423 (1961)); Harper, James, and Gray *The Law of Torts* § 7.10, at 445–46 (2d ed.1986); *see Call Carl, supra,* 554 F.2d at 631. "The only actionable fraud that could have been committed by [BP] lies ... in its misrepresentation of its existing intention to ... [renew a lease] at the time the actionable statements were made." *Id.* at 631. If a trier of fact were to determine that the Heckenbachs intentionally misrepresented their building plans, such a misrepresentation would be one of material fact.

█ In summary, the law in Maryland, as enunciated in *Fowler,* is that a plaintiff can successfully bring a tort action for fraud that is based on false pre-contract promises by the defendant even if (1) the written contract contains an integration clause and even if (2) the pre-contractual promises that constitute the fraud are not mentioned in the written contract. Most of our sister states apply a similar rule. *See* Kevin Davis, *Licensing Lies: Merger Clauses, the Parol Evidence Rule and Pre–Contractual Misrepresentations,* 33 Val. U.L.Rev. 485, 491 (hereafter "Davis"). *See, e.g., Keller v. A.O. Smith Harvestore Products, Inc.,* 819 P.2d 69, 73 (Colo.1991); and *Tallmadge Brothers, Inc. v. Iroquois Gas Transmission System, L.P.,* 252 Conn. 479, 746 A.2d 1277, 1291–92 (2000).

A good explanation of why a general merger clause does not bar parol evidence of pre-contractual fraudulent representa-

---

8. The *Call Carl* Court cites our decision in *Blondes v. Hayes,* 29 Md.App. 663, 350 A.2d 163 (1976), and *Schwartzbeck v. Loving Chevrolet, Inc.,* 27 Md.App. 139, 339 A.2d 700 (1975), for the proposition quoted.

tions was provided in *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957):

Indeed, if it were otherwise, a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement. Such, of course, is not the law. (See *Bridger v. Goldsmith*, 143 N.Y. 424, 427–429, 38 N.E. 458; *Ernst Iron Works v. Duralith Corp.*, 270 N.Y. 165, 169, 200 N.E. 683; *Angerosa v. White Co.*, 248 A.D. 425, 431, 290 N.Y.S. 204, *affd.* 275 N.Y. 524, 11 N.E.2d 325; see also, 3 Williston on Contracts [rev. ed., 1936], §§ 811–811A, p. 2277 *et seq.*, 3 Corbin on Contracts, § 578, p. 242 *et seq.;* 2 Restatement, Contracts, § 573.)

"I assume," Judge O'Brien long ago declared on behalf of a unanimous court in *Bridger v. Goldsmith (supra*, 143 N.Y. 424, 428, 38 N.E. 458), "that there is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may, nevertheless, contract with him in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. The maxim that fraud vitiates every transaction would no longer be the rule but the exception. *It could be applied then only in such cases as the guilty party neglected to protect himself from his fraud by means of such a stipulation.* Such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing." In other words, "the law does not temporize with trickery or duplicity. A contract, the making of which was induced by deceitful methods or crafty device, is nothing more than a scrap of paper, and it makes no difference whether the fraud goes to the factum, or whether it is preliminary to the execution of the agreement itself." (*Angerosa v. White Co., supra*, 248 A.D. 425, 431, 290 N.Y.S. 204, *affd.* 275 N.Y. 524, 11 N.E.2d 325.) And, in the *Ernst Iron Works* case (*supra*, 270 N.Y. 165, 169, 200

N.E. 683), the court wrote, "A rogue cannot protect himself from liability for his fraud by inserting a printed clause in his contract. This principle disposes of the blanket clause providing that no representation shall be binding unless incorporated in the agreement."

*Id.* at 909 (emphasis added).

The Heckenbachs' main point in this appeal is that the Greenfields cannot prove fraud because one of its essential elements is reasonable reliance on the misrepresentation of another. The Heckenbachs maintain that the Greenfields, as a matter of law, could not have reasonably relied upon their oral misrepresentation, because the integration clause says that neither the sellers nor their agents "shall be bound by any term ... or representation not herein contained." If this argument were to obtain, it would mean that even if fraud is alleged, the parol evidence rule would prohibit the introduction of evidence of fraud. This argument is contradicted by the very language of the rule itself—which lists fraud as an exception. *See Canatella, supra,* 264 Md. at 200, 286 A.2d 122. The argument is also fatally undermined by language used by the Court in *Fowler,* 229 Md. at 583, 185 A.2d 344. *See also Danann, supra.*

This does not mean that the integration clause can be disregarded. The presence of the integration clause goes directly to the disputed factual question of whether the Greenfields were actually deceived by the representations made by the Heckenbachs. At trial, it may also be an important factor for the jury to consider in determining (1) whether fraudulent misstatements were made by the Heckenbachs; (2) if made, whether the Greenfields deemed them material; and (3) even if there was reliance, whether the Greenfields reasonably relied on such representations in a case where both buyers were licensed and experienced attorneys, who, if they read the contract, obviously would have understood its meaning. Nevertheless, for purposes of summary judgment, the parol evidence rule, as to Count I, where money damages are sought, does not prohibit introduction of evidence of intentionally false

representations that are at odds with language used in the integration clause.

Thus far, we have focused on the parol evidence rule as it relates to general merger clauses in tort suits where legal relief (a monetary award) is sought. We turn now to the issue of what exclusionary effect the parol evidence rule has when, as here, equitable relief (an injunction) is also sought. In that regard, the case of *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), is instructive.

In *Creamer*, the plaintiffs attempted to rescind a settlement agreement based on fraud of the defendants, which (allegedly) induced the plaintiffs to sign an agreement designed to settle a pending law suit. *Id.* at 111, 448 A.2d 332. Alternatively, the plaintiffs requested rescission on grounds of misrepresentation and unilateral mistake. *Id.* At a bench trial, the trial judge found that the defendants had not induced the agreement by fraud but instead had persuaded the plaintiffs to sign the agreement based on the defendants' "honest" and "unintentional misrepresentation." *Id.* at 112, 116, 448 A.2d 332. On that basis, the trial court rescinded the settlement contract, even though the agreement contained a general merger clause. *Id.* at 120–21, 448 A.2d 332. The Court of Appeals reversed this Court, which had affirmed the judgment of the trial court. *Id.* at 121, 448 A.2d 332. In its discussion of the issue of whether grounds for rescission had been proven, the Court distinguished between the fraud count and one alleging mere negligent misrepresentation. *Id.* at 119–20, 448 A.2d 332. The *Creamer* Court said:

> [I]n cases involving unintentional or innocent pre-contractual representations, this Court has regularly adhered to the parol evidence rule, and we see no reason to depart from it here.

> In the present case, the trial court found that Weinberg & Green [the petitioners] had made an oral representation, prior to signing the settlement agreement, that it would offer between $275,000 and $550,000 during settlement negotiations. The trial court also found that this representa-

tion had induced the limited partners [plaintiffs] to execute the written settlement contract. *If the court had further found that the law firm had acted fraudulently, a basis for rescission of the written contract would have existed, regardless of the terms of that contract.* However, the trial court found that the law firm's representation was honest and unintentional. Consequently, the oral pre-contractual representation can furnish a basis for relief to the limited partners only if the representation did not vary or contradict a term of the written contract.

No one has claimed in this case that the alleged parol promise to settle the underlying lawsuit for a specific range of dollars is consistent with the language of the original contract. Moreover, in our view, no such claim could validly be made. Assuming arguendo that there is some ambiguity in the written contractual promise to undertake "good faith settlement negotiations," no reasonable interpretation of that phrase is consistent with the claimed parol promise by the law firm to settle for a specific range of dollars. The limited partners' own evidence concerning the negotiations leading to the written settlement agreement showed that all persons involved recognized the inconsistency between a settlement for a dollar figure in the range claimed by the limited partners and the wording of the written contract. Furthermore, the remedy of rescission, upheld by both courts below, reflects the understanding that the alleged oral representation to settle for a specific dollar range contradicted the written settlement agreement; otherwise, there would have been no purpose in rescinding the written contract. Finally, the written settlement agreement contained the following provision:

"This agreement ... constitute[s] the entire agreement of the parties. There are no additional promises made by the parties except those expressly set forth in this agreement."

The above quoted clause expressly excludes all collateral promises.

It is clear, therefore, that the alleged oral promise or representation by the law firm to settle for a specific monetary range contradicted the terms of the written settlement contract. Consequently, the oral representation furnishes no basis for relief from the written contract.

*Id.* at 119–21, 448 A.2d 332 (footnote omitted) (emphasis added).

Based on the emphasized segment of the above quote from *Creamer*, together with the discussion in *Fowler, supra,* we hold that neither the parol evidence rule nor the integration (or merger) clause in the contract between the Heckenbachs and the Greenfields bars the plaintiffs, in the case *sub judice,* from presenting their Count I claim based on *fraud* for either legal or equitable relief.

## IV. *THE PAROL EVIDENCE RULE AND THE INTEGRATION CLAUSE AS IT RELATES TO COUNT II, THE NEGLIGENT MISREPRESENTATION COUNT*

In *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982), the question presented was whether there existed a tort action "for negligent misrepresentation independent of one for deceit." *Id.* at 330, 439 A.2d 534. The case arose out of the sale of an automobile dealership by one Howard Seney (and others) to Martens Chevrolet, Inc. ("Martens"). *Id.* During contract negotiations, Martens made it clear that if it bought the dealership it intended to continue running it. *Id.* at 331, 439 A.2d 534. Accordingly, Martens asked the seller about the dealership's current financial status. *Id.*

Mr. Seney responded by handing the buyers a handwritten financial "trend" sheet and stating, "this pretty well depicts the trends of how we have been doing." This sheet received by the Martens contained a list of the "net profit" figures for each year the dealership had been in operation, including a figure showing $2,211 profit for the previous year, 1975. Unknown to the buyers, this sum failed to incorporate adjustments for such items as bonuses and taxes which are routinely reflected in audited financial statements. Af-

ter examining the trend sheet, the accountant for the buyers asked during the negotiating period to inspect the audited financial statements of the dealership for 1975, but he was told by Mr. Seney that they had not been prepared. In a subsequent meeting, the Martens' accountant once more sought to review the audited financial statements, but again he was informed by Seney that no such documents existed. Throughout the negotiations Loving [the former operator of the dealership] and Seney failed to mention any other financial documents to the Martens which pertained to the profitability inquiry, and the sellers continually reassured the buyers that they could rely on the trend sheet as it accurately reflected the financial status of the dealership. Since this sheet revealed the Loving operation to be mildly profitable, the buyers, in reliance on it, concluded that with their industriousness and management efficiency they could substantially improve the profitability of the business. Accordingly, acting on behalf of their corporation, the Martens entered into an agreement with the owners of Loving Chevrolet for the purchase of the dealership on May 6, 1976.

*Id.* at 331–32, 439 A.2d 534.

After Martens took over the business, it discovered that the dealership had, prior to purchase, been running a substantial deficit. *Id.* at 332, 439 A.2d 534. Martens brought a tort suit against the sellers for negligent misrepresentation, breach of contract, and deceit. *Id.* at 330, 439 A.2d 534. The Court concluded, *inter alia,* that there existed a cause of action for negligent misrepresentation and that the trial judge erred in granting summary judgment against the plaintiff on that count. *Id.* at 338, 439 A.2d 534.

The Court said in a footnote:

Appellees have also argued that even if negligent misrepresentation is a viable tort action in this State, it can never be applied to statements made in connection with consummation of an arm's length transaction, as was involved in the present case. We find nothing in *Virginia Dare* or its progeny to support such a sweeping assertion and we reject

it. In addition, *appellees make oblique reference to a general integration clause in the contract of sale of the dealership which states that it "supercedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written. ..."* While not directly so stating, appellees imply that this clause shields them from liability for any breach of duty that otherwise may have been imposed. In this regard, we agree with the position taken by the New York Court of Appeals in *Jackson v. State:*

> A party to a contract cannot, by misrepresentation of a material fact, induce the other party to the contract to enter into it to his damage, and then protect himself from the legal effect of such misrepresentation by inserting in the contract a clause to the effect that he is not to be held liable for the misrepresentation which induced the other party to enter into the contract. The effect of misrepresentation and fraud cannot be thus easily avoided. If it could be, the implied covenant of good faith and fair dealing existing in every contract would cease to exist. [241 N.Y. 563, 150 N.E. 556 (1925) (adopting the opinion of Hubbs, J., in *Jackson v. State,* 210 A.D. 115, 205 N.Y.S. 658, 661 (1924); *compare Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).]

292 Md. at 338 n. 7, 439 A.2d 534 (emphasis added).

█ It is noteworthy that the Court in *Martens* refers, as we did *supra,* to the New York Court of Appeals case of *Danann Realty Corp. v. Harris, supra.* As noted in Part II, *supra, Danann* distinguishes the preclusive effect of a specific disclaimer of reliance from cases, like the one at hand, where the contract contains only a general integration clause. Based on the footnote quoted above, the *Martens* Court evidently did not believe that an integration clause (stating that it "supercedes all prior and contemporaneous agreements and understandings, inducements or condition, expressed or implied, oral or written ...") was fatally inconsistent with the alleged oral representation, relied upon by the purchasers, that the dealership was operating in the black. This latter interpreta-

tion is supported by a footnote in *Creamer*, decided about eight months after *Martens*, saying that the "particular [oral] misrepresentation upon which suit had been brought in *Martens* ... did not contradict any term in the contract which was involved in that case." 294 Md. at 119 n. 13, 448 A.2d 332. Utilizing the distinction discussed in *Danann*, *supra*, and considering what was said in *Martens Chevrolet* and *Creamer*, we hold that in a suit for negligent misrepresentation, where equitable relief is prayed, the existence of a general merger clause, standing alone, will not prevent the plaintiff from introducing evidence concerning pre-contractual promises, which are not mentioned in the written contract. In this regard, we agree with what the Court said in *Keller v. A.O. Smith Harvestore Products, Inc.*, 819 P.2d 69 (Colo.1991):

> Many other courts have also concluded that the mere presence of a general integration clause in an agreement does not bar a claim for negligent or fraudulent misrepresentation. *Agristor Leasing v. Saylor*, 803 F.2d 1401 (6th Cir.1986); *Moffatt Enters., Inc. v. Borden, Inc.*, 807 F.2d 1169 (3d Cir.1986) (applying Pennsylvania law); *Formento[ v. Encanto Business Park]*, 154 Ariz. 495, 744 P.2d 22; *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982); *Gilliland v. Elmwood Properties*, 301 S.C. 295, 391 S.E.2d 577 (1990). See also Restatement § 552C comment b (code and contract defenses are inapplicable in tort action); A. Corbin, Contract § 580 (1989 Supp.); W. Keeton, D. Dobbs, R. Keeton & E. Owen, Prosser and Keeton on the Law of Torts § § 110 (5th ed.1984). *We conclude that a general integration clause does not effect a waiver of a claim of negligent misrepresentation not specifically prohibited by the terms of the agreement. ...*
>
> The policy of encouraging honesty and candor in contract negotiations, which policy is reflected in the recognition of an implied covenant of good faith and fair dealing, supports this result. The implied covenant of good faith and fair dealing would virtually be eliminated if a contracting party could escape liability for negligent conduct simply by inserting a general integration cause into the agreement. *Mar-*

*tens Chevrolet, Inc. v. Seney,* 292 Md. 328, 337 n. 7, 439 A.2d 534, 539–40 n. 7 (1982). As the court in *Formento* stated, "a seller should not be allowed to hide behind an integration clause to avoid the consequences of a misrepresentation, whether fraudulent or negligent." *Formento,* 154 Ariz. at 499, 744 P.2d at 26.[9]

*Id.* at 73 (emphasis added).

█ Appellees was not entitled to summary judgment as to Count II based on the parol evidence rule.

## V. *STATUTE OF FRAUDS*

Section 5–104 of the Real Property Article of the Maryland Code (1996 Repl.Vol.) sets forth a portion of what is known as the statute of frauds:

**Executory contracts.**

No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him.

█ The Heckenbachs assert that the provisions of section 5–104 bar the Greenfields' claims for fraud and misrepresentations. The Greenfields reply that Count I (fraud) and Count II (negligent misrepresentation) are not "based on a contract and thus the statute of frauds is inapplicable" (citing 73 Am.Jur.2d—Statute of Frauds, Section 583, p. 222 (1974),

---

9. For a good discussion of a view contrary to the one expressed in *Keller, supra, see Sound Techniques, Inc. v. Hoffman,* 50 Mass.App.Ct. 425, 737 N.E.2d 920, 925–26 (2000), in which the court draws a distinction between fraud and negligent misrepresentation cases and holds that, under the parol evidence rule, a merger clause, standing alone, prohibits testimony of pre-contractual representations not mentioned in the written contract in negligent misrepresentation cases *Id.* The views expressed by the *Sound Techniques* court appear, however, to be at odds with language used in n. 7 by the Maryland Court of Appeals in the *Martens Chevrolet* case. 292 Md. at 338 n. 7, 439 A.2d 534.

which notes that tortfeasors are not "permitted to use the statute of frauds as a defense to a wrongful act").

The Greenfields assert—and the Heckenbachs admit for purposes of summary judgment—that the Greenfields were induced into purchasing Windrush Farm by the Heckenbachs' representation that they did not intend to build either the main house or the pier in a way that would block the water view of Irish Creek from Windrush Farm. The Heckenbachs contend that this expression of present intent amounted to a scenic easement (*i.e.*, a negative easement). *See* 4–34 *Powell on Real Property* § 34.02 (2001) for a discussion of scenic easements.

We agree with the Greenfields that the statute of frauds does not bar a tort suit for either fraud or negligent misrepresentation because those counts are not based "on ... [the] contract" between the parties but are based on misrepresentations that induced the contract.[10] See 73 Am.Jur.2d *Statute of Frauds* § 492 (2001) ("tortfeasors and fraudulent intermeddlers will not be permitted to use the statute of frauds as a defense to a wrongful act or as a means of consummating a fraudulent design.").

## VI. *LACHES*

The Heckenbachs claim that Counts I and II are barred by laches. Although those counts pray for both legal and equitable relief, the appellees treat both counts as if only equitable relief were sought. The appellees argue:

> The doctrine of laches consists of two elements: "negligence or lack of diligence on the part of the plaintiff in failing to assert his right, and prejudice or injury to the defendant." *Staley v. Staley,* 251 Md. 701, 703, 248 A.2d 655 (1968); *Shah v. HealthPlus, Inc.,* 116 Md.App. 327, 336, 696 A.2d 473 (1997), *cert. denied,* 347 Md. 682, 702 A.2d 291

---

**10.** The Greenfields' complaint alleges both a break of a promise (Paragraph 30—discussed in n. 3, *supra*), as well as allegations of fraudulent or negligent misrepresentation. We hold only that allegations of negligent or fraudulent inducement are not barred by the Statute of Frauds.

(1997). (A court should invoke the doctrine of laches and preclude a plaintiff from asserting claims if the plaintiff failed "to act with due diligence in the pursuit and enforcement of his rights," the delay was unnecessary and the defendant has been prejudiced by the delay.)

The doctrine of laches applies regardless of the length of the plaintiff's delay in asserting its rights. Accordingly, a delay of only a few months can operate as a bar. *See, e.g., Parker v. Board of Election Supervisors*, 230 Md. 126, 186 A.2d 195 (1962) (delay of 9 months precluded plaintiff's claims).

The prejudice suffered by the defendant can take two forms: "(1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed [its] position in a way that would not have occurred if the plaintiff had not delayed." *The Finance Company of America v. BankAmerica Corp.*, 502 F.Supp. 593, 596 (D.Md.1980).

The appellees contend that the Greenfields had knowledge of all material facts upon which they could have brought suit by late June 1998—the date of the party at Windfield Farm that the Greenfields attended.[11] They assert

---

11. "Laches is a defense in equity against stale claims; the word, itself, derives from the old French word for laxness or negligence." *Buxton v. Buxton*, 363 Md. 634, 645, 770 A.2d 152 (2001). "There is no inflexible rule as to what constitutes, or what does not constitute, laches; hence its existence must be determined by the facts and circumstances of each case." *Parker v. Board of Election Supervisors*, 230 Md. 126, 130, 186 A.2d 195 (1962). The passage of time, alone, does not constitute laches but is simply "one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made." *Id.* Even if an impermissible delay is present, if the delay "has not prejudiced the party asserting the defense, it will not bar the equitable action." *Schaeffer v. Anne Arundel County*, 338 Md. 75, 656 A.2d 751 (1995). "[S]ince laches implies negligence in not asserting a right within a reasonable time after its discovery, a party must have had knowledge, or means of knowledge, of the facts which created his cause of action in order for him to be guilty of laches." *Parker*, 230 Md. at 131, 186 A.2d 195.

Most jurisdictions hold that "[t]he nature of the relief sought generally determines whether a claim is an action at law or a suit in equity."

that the fifteen-month delay (between June 1998 and the date suit was filed) caused "severe prejudice."

Insofar as the pier is concerned, the fifteen-month delay created no prejudice—at least none shown in the record. The pier was completed in January 1998—long before the Greenfields knew of its location.

As far as the main house is concerned, the Heckenbachs say only that it was uncontroverted that the Greenfields "watched in silence as [they] completed construction of the main house and moved into it." There is nothing in the record to indicate how the Heckenbachs would have reacted if the Greenfields had protested the location of the main house in late June 1998. Moreover, in light of the fact that the main house was "substantially completed" (Mrs. Greenfield's words) when she and her husband discovered the location of the house, it cannot be said, as a matter of law, that the fifteen-month delay prejudiced the Heckenbachs. Because there was, at a minimum, a material issue of fact as to whether the Heckenbachs were prejudiced by the fifteen-month delay, we hold that the portion of Counts I and II that prayed for equitable relief were not barred by the doctrine of laches.

## VII. *ESTOPPEL*

 Appellees contend that the doctrine of equitable estoppel bars Counts I and II. In order for the doctrine of equitable estoppel to justify the grant of summary judgment against the Greenfields, the Heckenbachs would have to present undisputed facts that they relied to their detriment on

---

*Association of Unit Owners of the Inn at Otter Crest v. Far West Federal Bank*, 120 Or.App. 125, 852 P.2d 218, 224 (1993); *See also Perry v. Gadsden*, 313 S.C. 296, 437 S.E.2d 174, 178 (App.1993) (stating that "[a]ctionable fraud is an action at law unless an equitable remedy is sought"); *Hudson View II Associates v. Gooden*, 222 A.D.2d 163, 168, 644 N.Y.S.2d 512 (N.Y.App.Div.1996); *O'Bryant v. City of Midland*, 949 S.W.2d 406, 414 (Tex.Ct.App.1997); *Hicks v. Allegheny East Conference Association of Seventh day Adventists, Inc.*, 712 A.2d 1021, 1022 (D.C. 1998); *Hein v. M & N Feed Yards, Inc.*, 205 Neb. 691, 289 N.W.2d 756, 759 (1980); *Abraham v. County of Hennepin*, 639 N.W.2d 342 (Minn. 2002).

some action, or inaction, of the Greenfields. *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 631, 726 A.2d 818 (1999). The Heckenbachs presented no such proof to the motions court. *See* Part V, *supra.*

## VIII. *MERGER BY DEED*

 Appellees' final argument is that the doctrine of merger by deed justified the motion court's grant of summary judgment. We disagree. The doctrine of merger by deed provides that, ordinarily, upon delivery and acceptance of a deed, all prior negotiations are merged into the deed, thereby eliminating any contractual rights not included in the deed. *See Dorsey v. Beads,* 288 Md. 161, 170–71, 416 A.2d 739 (1980). Nevertheless, the doctrine is "subject to avoidance when the defenses of fraud and mistake are properly invoked." *Id.* at 171, 416 A.2d 739 (quoting 4 H. Tiffany, *Law of Real Property* (3d ed.1975), § 981.05, at 118–19); *see also Buckner v. Hesson,* 159 Md. 461, 150 A. 852 (1930); *Wilson v. Watts,* 9 Md. 356 (1856).

The doctrine does not apply when, as here, contractual rights do not form the basis of the plaintiffs' claims. Moreover, the Greenfields have set forth facts that, if believed by the jury, would show that the appellees were guilty of fraud.

**JUDGMENT AS TO COUNTS III, IV, AND V AFFIRMED; JUDGMENT AS TO COUNTS I AND II REVERSED; CASE REMANDED TO CIRCUIT COURT FOR TALBOT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID FIFTY PERCENT BY APPELLANTS AND FIFTY PERCENT BY APPELLEES.**